Filed 3/25/26  P. v. Pantoja CA5
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DANIEL PANTOJA,<br><br>Defendant and Appellant. | F083581<br><br>(Super. Ct. No. 1423449)<br><br>**OPINION** |

-oOo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Nancy A. Leo, Judge.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland and Lance E. Winters, Chief Assistant Attorneys General, Kimberley A. Donohue and Michael P. Farrell, Assistant Attorneys General, Christopher J. Rench, Eric L. Christoffersen and Brook A. Bennigson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Petitioner Daniel Pantoja petitioned the superior court, pursuant to former section 1170.95 (now § 1172.6) of the Penal Code,[1] for resentencing on his conviction for first degree murder (§ 187). The superior court conducted an evidentiary hearing and denied the petition on the grounds petitioner was a major participant in the underlying felony who acted with reckless indifference to human life and, alternatively, directly aided and abetted in the murder with intent to kill.

On appeal, petitioner argued the evidence was insufficient to support the superior court's findings that he was a major participant, acted with reckless indifference, and acted with intent to kill. We initially determined substantial evidence supported the court's finding that petitioner was a major participant in the underlying felony who acted with reckless indifference to human life. On that basis, we affirmed.

Our Supreme Court granted petitioner's petition for review (S281228) and transferred the matter to us with directions to vacate our opinion and reconsider the cause in light of *People v. Emanuel* (2025) 17 Cal.5th 867 (*Emanuel*). In accordance with the direction from the Supreme Court, we vacated our prior opinion and gave the parties an opportunity to file supplemental briefing.

In supplemental briefing, petitioner again argues substantial evidence does not support the court's finding he acted with reckless indifference to human life. He contends this is particularly true under the reckless indifference standard as recently clarified by our Supreme Court in *Emanuel*. Alternatively, even if the evidence is sufficient to support the court's findings, he contends the order denying the petition must

---

[1] Undesignated statutory references are to the Penal Code. Former section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We will refer to the current section 1172.6 in this opinion.

be reversed to allow the court to redetermine whether petitioner acted with reckless indifference to human life, taking into consideration his youth at the time of the offense.[2]

Having now reconsidered the cause in light of *Emanuel*, we once again conclude substantial evidence supports the court's finding that petitioner was a major participant in the underlying felony who acted with reckless indifference to human life. However, for reasons we explain, we conclude remand is warranted to allow the court to reconsider its findings, taking into consideration petitioner's youth at the time of the offense. We also conclude substantial evidence does not support the court's finding that petitioner aided and abetted the murder with intent to kill and the denial of the petition therefore cannot be upheld on this alternative ground.

Accordingly, we reverse the order denying the petition and remand for further proceedings.

## PROCEDURAL AND FACTUAL HISTORY

### I.     Underlying Convictions

Petitioner was charged, together with T.D. and J.P., with murder (§ 187, subd. (a); count I) and attempted carjacking (§§ 215, subd. (a), 664; count II). As to both counts, it was alleged the crime was committed for the benefit of or in association with a criminal street gang (§ 186.22, subd. (b)(1)), and that a principal personally and intentionally discharged a firearm, proximately causing great bodily injury or death (§ 12022.53, subds. (d), (e)(1)). Petitioner's motion to sever trials was granted, and dual juries were empaneled, one for petitioner's trial and the other for the trial of T.D. and J.P. (*People v. Diaz* (2018) 21 Cal.App.5th 538, 541 (*Diaz*)[3]; *People v. Pantoja* (Oct. 27, 2020,

---

[2] Petitioner previously raised this argument in his reply brief. Ordinarily, we do not consider issues raised for the first time in a reply brief. (See *In re Luke H.* (2013) 221 Cal.App.4th 1082, 1090.) As such, this argument was not addressed in our prior opinion.

[3] Our decision in petitioner's direct appeal was partially published. (See *Diaz*, *supra*, 21 Cal.App.5th 538; see *id.* (Mar. 20, 2018, F071348), as mod. Apr. 10, 2018 [nonpub. opn.].) The nonpublished portions of the opinion fall within the exception to

F079427) [nonpub. opn.] (*Pantoja*).)  As discussed in greater detail below, "[t]he prosecution presented evidence to both juries that showed T.D. was the actual killer.  [Citation.]  In addition, J.P. testified before both juries that T.D. fired the fatal shots." (*Pantoja*, F079427.)

J.P. was acquitted.  T.D. was convicted on count I of first degree murder committed during the commission of an attempted carjacking, and on count II of attempted carjacking.  His jury found the firearm discharge allegation true, but the gang allegation not true.  Petitioner was similarly convicted on counts I and II, but his jury was unable to reach unanimous findings on the enhancement allegations, and those allegations were subsequently dismissed on the prosecutor's motion.  (*Diaz*, *supra,* 21 Cal.App.5th at p. 541; *Pantoja*, *supra*, F079427.)  Petitioner was sentenced to a term of 25 years to life, plus two years, six months.  On appeal, we affirmed the judgment but remanded for the limited purpose of affording petitioner the opportunity, pursuant to *People v. Franklin* (2016) 63 Cal.4th 261, to make a record of information relevant to his eventual youth offender parole hearing.  (*Diaz*, at pp. 546–547; see *Pantoja*, F079427.)

## II.    Initial Proceedings on Section 1172.6 Petition

Petitioner filed a petition for resentencing pursuant to section 1172.6.  The superior court found he established a prima facie showing he was entitled to relief and appointed counsel, but failed to issue an order to show cause and instead proceeded to deny the petition on the merits without holding an evidentiary hearing.  Petitioner appealed, and we reversed the order denying the petition and remanded with directions for the court to issue an order to show cause and hold an evidentiary hearing.  (*Pantoja*, *supra*, F079427.)

---

the California Rules of Court, rule 8.1115(b)(1).  Petitioner previously requested to augment the record on appeal with the opinion.  We construed the request as a request for judicial notice and granted it.  Accordingly, we will deny as moot respondent's request for judicial notice, which was presented in respondent's brief.

## III.    Briefing on Remand

On remand, the People argued petitioner was not entitled to resentencing because he was a major participant in the carjacking who acted with reckless indifference to human life and, alternatively directly aided and abetted in the murder with intent to kill. The People asked the court to take judicial notice of our prior opinions in petitioner's direct appeal and his appeal from the initial denial of his section 1172.6 petition, as well as the entire court file in the underlying action and the record of the two appellate matters.

In response, petitioner argued he was not guilty of murder under current law because he was not a major participant in the carjacking and did not act with implied malice.  He argued the evidence relied on by the People for a contrary conclusion was irrelevant or was not credible.  Additionally, petitioner argued the court could not consider the gang evidence presented at trial, inasmuch as the jury did not reach a verdict on the gang allegation.  Petitioner's brief purported to "incorporate[] by reference" (boldface omitted) the trial transcripts and trial exhibits.

## IV.    Evidentiary Hearing

At the evidentiary hearing, the parties relied on testimony from petitioner's trial and two surveillance videos that had been entered into evidence at trial.  Additionally, petitioner called live witnesses at the evidentiary hearing.  We describe below the evidence and argument that was before the superior court when it considered petitioner's petition for resentencing.

### A.    Trial Evidence[4]

The offenses at issue in this case arose from the fatal shooting of Chaz Bettencourt outside a gas station convenience store in Riverbank in the early morning hours of

---

[4] The People asked the superior court to take judicial notice of the record of conviction and the entire court file, including the transcripts and exhibits from petitioner's trial.  Petitioner likewise relied on the trial transcripts and trial exhibits.  The

5.

August 5, 2010.[5]  The events leading up to the murder took place at several locations. The convenience store where the shooting took place was located on the corner of Oakdale Road and Patterson Road.  A market visited by petitioner and his codefendants prior to the shooting was located approximately one half to three quarters of a mile away on Patterson Road.  A movie theater was located between the market and the convenience store.

Between 10:30 and 11:00 p.m. on August 4, Timothy G. and Derek P.[6] left Timothy's house in Riverbank to walk a female friend home.  Their route took them past the movie theater and the convenience store.  As the trio was passing the movie theater, Timothy saw three people wearing white shirts, who appeared to be males, on the corner about a block away.  Derek went over to them, then returned and said he was going to buy the three some alcohol and make some money.  Timothy took the woman the rest of the way to her home.

Surveillance video taken from the market showed Derek entering the market shortly before 11:00 p.m., followed by J.P., T.D., and petitioner.  The video revealed that J.P. was wearing jeans and a dark shirt and cap, while T.D. and petitioner were wearing white shirts and dark caps.  Petitioner and his companions looked at some items in the store, and fingerprint analysis showed T.D. and petitioner handled a small package of cigars on the counter.  J.P. purchased a bag of chips.  Derek purchased two beverage

---

court did not expressly address the People's request for judicial notice, but relied on the trial record in its ruling.  We previously granted petitioner's request for judicial notice of the record on appeal in petitioner's direct appeal, case No. F071348.  Although our summary is in many respects similar to the factual summary presented in *Diaz*, *supra*, F071348, our summary of the evidence is based on our own review of the record from petitioner's trial and the trial of his two codefendants.  (See § 1172.6, subd. (d)(3).)

[5] Unspecified dates are to the year 2010.

[6] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials.  No disrespect is intended.

6.

cans.  The video showed T.D. fiddling with his pants and waistband through his time at the market.

Timothy passed through the parking lot behind the movie theater around 11:00 p.m. or shortly after and saw the three men he earlier had seen talking with Derek. The men jumped the fence from an adjacent school yard into the movie theater parking lot.  He heard at least one person loudly yelling gang identifiers.  Timothy passed them, then turned and looked over his shoulder.  The three were walking in the direction of the convenience store.

Meanwhile, David G. got off work at midnight.  As he was driving home, he saw his friend, Chaz Bettencourt.  David asked if Bettencourt wanted to go to the convenience store with him.  Bettencourt got into the passenger seat of the car and they drove to the convenience store.  This was around 12:35 a.m. on August 5.

David parked on the left side of the store, right in front of the door.  While he was getting his money together, Bettencourt got out of the car and went inside.  As David exited the vehicle, he noticed three males walking toward him from the direction of the gas pumps.  David glanced at them, then went inside the store.  Store surveillance video showed petitioner, T.D., and J.P. walking across the parking lot toward the store.  As they neared David's vehicle, petitioner split off from the others and walked behind David's vehicle, toward the passenger side, while T.D. and J.P. moved in the direction of the store entrance, closer to the driver's side of the vehicle.

As David walked into the store, Bettencourt was already at the register, either purchasing something or talking to the clerk.  David, who intended to buy some iced tea, noticed the three males were leaning against the store windows, right in front of his car. As David made his purchase, Bettencourt walked outside and waited by the passenger door of the car.

As David exited the convenience store, T.D. acted like he was walking away from the store toward the gas pumps. He then came behind David, pointed a gun in his face, and started demanding the keys to the car. Store surveillance video showed T.D. pointing the gun toward the back of David's head and then his face. At that time, according to David, petitioner and J.P. were still standing in front of the car. T.D. said, "Give me your fucking keys. I will blast you." When David looked at the gun, T.D. racked the slide back, cocking the gun, and said in an intimidating tone of voice, "This is real."

David started backing up with his hands up, although he did not turn over his keys. He was focused on the gun and did not know what petitioner and J.P. were doing at that point. Store surveillance video showed J.P. and petitioner following T.D. as he and David backed toward and around the trunk of the car. David went around the trunk and along the passenger side toward the hood. T.D. followed with the gun pointed at David's face. David did not know where Bettencourt was and did not hear him say anything. David was still focused on the gun. David moved toward the convenience store doors, where there were security cameras and lights, and T.D. stayed by the hood of the car.

As David backed toward the front door of the convenience store, J.P. came from behind and started blocking him, using his body to push David away from the doors. J.P. told David that he "need[ed] to go back over there," toward the bathrooms, where it was very dark and there were no security cameras. J.P. said he had a gun. Although he never displayed a firearm, J.P. reached down into his pocket and shook it around, as if he was going to pull out a gun. David did not know where petitioner was at this time. David tried to get past J.P. Their bodies were in contact for about 15 seconds. Surveillance video showed David and J.P. struggling against the doors of the convenience store.

J.P. moved out of the way and went back toward David's car. David got inside the convenience store and told the clerk to call 911, and that the assailants had a gun. About 10 to 15 seconds later, he heard two gunshots. They sounded like they came from the direction of his car. David could see his car, but did not see any bodies.

8.

M.C. was pulling up to the gas pumps outside the convenience store when she saw "a few guys" on the side of a car parked in front of the store. One shot the other one twice from several feet away. She could not recall where the shooter and victim were standing at the time of the shooting, except that they were near the car.[7] At least two other young men were standing near the front of the car. The one who was shot ran toward the gas pumps and fell. "[A] bunch of kids" ran on the other side of the store. They wore baggy clothes and looked "thug-ish." M.C. was in shock and did not know what to do, so she just left.

David stayed inside the store for another 20 to 25 seconds, but did not see anyone. When he went outside, he found Bettencourt lying on his back some distance from David's car. Petitioner, T.D., and J.P. were gone.

At approximately 12:45 a.m. on August 5, Stanislaus County Sheriff's Deputy Moss was on patrol in Riverbank when he was dispatched to the convenience store. When he drove into the parking lot, he saw Bettencourt, lying on his back. David was standing over him. Bettencourt was alive but unresponsive. He had sustained two gunshot wounds to the chest. He subsequently died from his injuries.

David's vehicle was parked to the west of the front door of the convenience store. In each of the two parking spaces to the west of the passenger side of the vehicle was a black cloth shoe. A spent .22-caliber shell casing was found west of the front door of the store, close to the building and near the front passenger side of David's vehicle. A black shoe was found south of the convenience store in the parking lot for other businesses. A small, semiautomatic, .22-caliber handgun, with the serial number scratched off, was found in the dirt near bushes about 100 yards south of the convenience store.[8] There was

---

[7] At different points, she testified the shooter and victim were on the side of the car, on the side of the car closest to the store door (i.e., the driver's side), near the car, near the passenger door, and near the rear driver's side of the vehicle.

[8] At trial, David identified this gun as the one T.D. pointed at him.

an expended shell casing still in the chamber. It appeared the gun had jammed. Next to the gun was a .22-caliber magazine that contained eight rounds of ammunition. Two bullets were recovered from Bettencourt's body. One had rifling characteristics similar to bullets that were test-fired from the gun recovered near the scene, although a conclusive determination could not be made. The other recovered bullet was too heavily damaged for comparison. The expended cartridges were determined to have been fired in the pistol.

Timothy learned of the shooting when he woke on the morning of August 5. Wondering if the three individuals he had seen walking toward the convenience store were involved, he sought out Derek and learned Derek had purchased Four Loko for them. Timothy then went to the back fence of a schoolyard adjacent to the movie theater, where he had seen the three jump down into the movie theater lot, and found a Four Loko malt beverage can. He left it there and notified the sheriff's department.[9] T.D.'s and petitioner's DNA was found on the can, which was 23.5 ounces in size.

On August 6, David was shown two photographic lineups. David immediately identified a photograph of T.D. and said he was the person holding the gun. David was unable to recognize anyone in the lineup containing petitioner's photograph. After J.P. turned himself in on August 12, a photographic lineup containing his picture was shown to David. David was unable to identify J.P.

Petitioner's mother, Kellie S., testified in both the prosecution and the defense cases. Around 4:00 p.m. on August 4, she saw petitioner, T.D., and J.P. together at her

---

[9] Timothy spoke to Stanislaus County Sheriff's Deputy Bennett, who seized the empty can. Timothy told Bennett that he had seen three subjects climbing over the fence from the school side into the theater parking lot. Timothy described them as being two Hispanics and one Black person. He said they were throwing gang signs and shouting gang identifiers and they threatened to "kick [his] ass." Timothy told Bennett one was holding a can of "Four Clowns" beer, which he threw over the fence into the yard of the school.

house. She did not recall seeing any of the trio with a firearm and did not recall them having any conversation regarding a firearm. She estimated the trio left the house shortly before dark and returned to her house on August 5, while it was still dark. At petitioner's request, she drove them to T.D.'s home in Turlock. During the drive, she overheard petitioner say to T.D. and J.P., "I can't believe you did that, Bro." She dropped the three off at T.D.'s house and returned home. While driving home, she had a telephone conversation with petitioner, in which he told her, "[T.D.] shot somebody, Mom. He's stupid." She recalled petitioner telling her, "They were trying to take his car." She confirmed that petitioner used the word "they." Petitioner told her that he heard a "[p]op, pop," and turned to see the victim take a couple of steps and then fall, after which petitioner, T.D., and J.P. took off running. Petitioner cried during the phone call. She recalled hearing a conversation going on in the background but could not recall what was said. Kellie relayed this information to Stanislaus County Sheriff's Detective Hatfield during an interview on August 6. At trial, she confirmed petitioner received a settlement from a car accident shortly before the shooting, but she did not know how much he received or what he did with the money.[10]

Hatfield also testified. According to Hatfield, Kellie told him that, prior to the shooting, she heard T.D. ask petitioner if he "had the piece." However, Kellie did not see any gun on the day of the shooting. Kellie also told Hatfield about a conversation she overheard while she was on the phone with petitioner during her drive home. Kellie reported that she heard T.D.'s mother say something to the effect of, "Why did you point the gun at him and shoot him for?" Kellie heard T.D. reply, "That's what you do when you point a gun at someone, isn't it?"

---

[10] Petitioner's stepfather reported to Hatfield that petitioner purchased a .22-caliber handgun with the settlement money approximately two weeks prior to the shooting. However, this evidence was presented only to T.D. and J.P.'s jury, and not petitioner's jury.

Extensive gang evidence was presented at trial. Because the evidence is of limited relevance to the resentencing petition, we summarize it briefly and generally. Petitioner was identified as a suspect in an apparent gang-related beating that took place at a gas station in Redding on June 6. A MySpace page attributed to petitioner contained a link to the beating surveillance video and a gang-related comment regarding the video. Petitioner later admitted to law enforcement that he was depicted in the video. On July 22, a few days before the shooting, T.D., J.P. and petitioner were together at the Stanislaus County Fair. A sheriff's deputy saw T.D. making what appeared to be a gang sign and the group was told to leave the fair. When T.D.'s residence was searched on August 6, law enforcement encountered T.D.'s biological father, who had visible gang tattoos. On September 13, T.D. and petitioner were located inside the Redding residence of a known gang member.

The People's gang expert presented extensive background testimony regarding the operations of the relevant local gangs and gang subsets. He opined that petitioner's MySpace page contained numerous gang references. He opined that petitioner and T.D. were active gang members. He opined that J.P. was not a gang member, but rather a trusted associate of the gang. In response to a hypothetical question based on the prosecution's evidence concerning the charged offenses, the expert opined that the events benefited the gang, were committed in association with the gang, and were committed by gang members and an associate acting together. A defense gang expert provided extensive testimony disagreeing with the testimony of the People's expert.

J.P. testified in the defense case. He was 15 years old when he was arrested in this case. Both his parents are African-American. Neither was gang affiliated.

Prior to his arrest, J.P. resided in Turlock, about five blocks from Columbia Park. He often went there to play, as there were always other people there. He met T.D., who lived across the street from the park, about five months before the events of this case. They met at a barbecue given by a friend of J.P. After that, they "[k]ind of maybe a little

bit" became friends. They played basketball together at the park, and they went to the fair the one night. J.P. met petitioner a couple of times when petitioner was at the park with T.D. Except for the first time J.P. met T.D., if T.D. was present, petitioner was also there. These occasions usually involved playing basketball and/or smoking marijuana.

J.P. denied being a gang associate.

J.P. had not been to Riverbank before August 4. That afternoon, J.P. was with "Ray Ray." Originally, J.P. was supposed to go to Ray Ray's house in Modesto, but he and Ray Ray saw T.D. and petitioner at the bus stop. T.D. and petitioner said there was a party in Riverbank that night. Ray Ray could not go because he had other commitments, but J.P. decided he would attend. J.P. had $30 or $35 that he got either from his mother or from doing chores for his aunts. He also had some marijuana in a bag. J.P. had smoked a blunt (a small cigar in which the tobacco had been replaced with marijuana) before he got on the bus. J.P. was a regular user of marijuana and had built up a tolerance for it. It made him relaxed and mellow.

The four rode the bus from Turlock to Modesto, where they had to switch buses to continue on to Riverbank. Ray Ray left them at the bus stop in Modesto, and T.D., petitioner and J.P. then took the other bus to Riverbank. There was no discussion about committing crimes. J.P. did not know T.D. or petitioner had a gun.

When the three got off the bus and were walking to petitioner's house, they saw an ice cream man who was pushing a cart. Petitioner told T.D. and J.P. to "watch this," that he was going to get the ice cream man. There had been no discussion about robbing the ice cream man, but petitioner pulled a gun from his waist. His shirt had been over it. Petitioner crossed the street to the ice cream man, pointed the gun at him, and demanded money. The man put up his hands, and petitioner reached into the man's pocket and took the money. Petitioner then got on a bicycle he had had with him since J.P. first met up with them, and rode off. T.D. knew where petitioner lived, and he and J.P. kept walking to petitioner's house. Once there, nobody talked about what had happened. Petitioner

13.

had gotten around $70 or $80. J.P. did not ask for or receive any of it. He did not think T.D. was given any of it, either.

At petitioner's house, petitioner, T.D. and J.P. smoked marijuana and watched television. Petitioner's parents left, and petitioner had to babysit his younger siblings. Around this time, T.D. and J.P. went to a place nearby that sold "taco truck burrito[s]," and they each ate one. They then returned to petitioner's house.

Up to that point, nobody had been drinking any alcohol. Petitioner telephoned his mother and then his stepfather and asked them to get Four Loko from the store. When petitioner's stepfather returned to the house, he gave petitioner four cans of Four Loko. J.P. did not drink any. Petitioner and T.D. each drank one, then the three left the house. As they were walking, petitioner and T.D. were each drinking another one. The three had also shared about three blunts by that time. All J.P. knew was that the party was supposed to be later that day. Because he had never been to Riverbank, he did not really know where they were supposed to be.

After leaving petitioner's house, the three walked to a store down the street, where they got more cigars.[11] They then went to the home of someone petitioner knew, where they smoked more marijuana. J.P. was feeling the effects of the marijuana. He was relaxed.

The three left after about 15 to 20 minutes and started walking again toward the party. They saw Derek, whom J.P. had never met. At the market, Derek bought them cans of Four Loko. J.P. merely purchased a bag of chips with his own money.

The three left the market and walked to the school behind the movie theater. As far as J.P. knew, they still had plans to go to the party. At the school, they went up on the roof, smoked marijuana, and petitioner and T.D. drank. Petitioner and T.D. each had a

---

[11] The cigars J.P. favored could be purchased individually or in a pack. The three bought them individually. T.D. and petitioner appeared to have their own money.

can of Four Loko. J.P. did not remember if they passed it back and forth, who finished first, or whether they shared the last part of the last can.

The three stayed on the roof for a little while, then got back down. There were benches at the school, and they went and "chilled" on the benches, smoking marijuana and a regular cigar, for about 10 minutes. After that, they climbed over a wall. J.P. believed petitioner and T.D. were drunk. J.P. did not recall anyone shouting anything gang related or seeing Timothy. He did not see anyone throwing gang signs. There was no discussion whatsoever about gangs.

J.P. thought "he" finished his can of Four Loko and threw it over the fence, but he did not remember clearly.[12] The three then walked around to the front of the theater. There were two older ladies coming from the movies. Petitioner suggested they rob the ladies and he pulled out the same gun he had used earlier. J.P. refused, saying something like, "That's stupid," or "Why would you want to rob ladies?" T.D. agreed and said, "Yeah, that is stupid." J.P. did not intend to rob anybody and did not urge T.D. or petitioner to rob someone. Still holding the gun, petitioner said to T.D. or both T.D. and J.P., "Don't bitch up," or "Don't get soft." T.D. then said he wanted to see or to hold the gun, and petitioner gave it to him.[13] T.D. did not say anything about committing a robbery, and the three did not discuss committing robberies.

---

[12] J.P. was not asked to specify whether "he" referred to T.D. or petitioner.

[13] D. Wallace, a private investigator working on petitioner's behalf, had, through his experience and observations, an enhanced ability to observe and recognize when someone was carrying a concealed handgun. In his opinion, the surveillance video from the market showed T.D. checking his waistband and adjusting his pants in a manner that suggested he was carrying a handgun in his waistband while inside the store. He could not say for certain what was under T.D.'s shirt, however. Wallace acknowledged he had seen a number of men at the courthouse, pulling up their pants in the same way and yet getting through the metal detector. J.P. also acknowledged T.D. was adjusting his pants at the market, but he did not think it was because he had the gun.

Wallace also investigated J.P.'s account of the robbery of the ice cream man. He was unable to find any evidence any such robbery occurred.

The three headed to the convenience store down the street so petitioner could buy more cigars to hollow out for marijuana. There was no discussion about doing anything of a criminal nature. J.P. had no intention of committing a crime. J.P. did not go inside with petitioner, because, although petitioner was old enough to buy cigars, there was a possibility the clerk might not sell to him if he thought petitioner was buying for a minor. There was no plan to commit a crime.

As they approached the convenience store, petitioner broke away from J.P. and T.D. and said something to them, but J.P. could not recall what was said. At one point, J.P. testified they did not go into the convenience store because he was getting ready to give petitioner some money to buy cigars. Later, however, he testified that they did not go inside because T.D. had pulled out a gun. T.D. pulled the gun on David, who was coming out of the store and walking toward his car. T.D. had not said anything to J.P. or petitioner prior to pulling the gun. There had been no discussion about robbing David. Bettencourt was on his cell phone on the other side of the car. Nobody said anything to Bettencourt before T.D. pulled the gun. When the gun was pulled, J.P. was behind T.D., although he was not sure how far. Petitioner was beside J.P. The gun was tucked into T.D.'s waist, under his shirt.

T.D. pulled the gun, put it in David's face, and told David to give him his keys. David had his hands up. He had a drink in one hand and the keys in the other hand, and he told T.D. that he was not going to give him the keys. Neither J.P. nor petitioner said anything, but, as David and T.D. went around the car, J.P. walked behind T.D. He did not know why, as he had no intention of stealing a car or robbing anyone, or of acting as a gang associate.

At some point, T.D. put his hand on top of the gun and slid it back. David broke away from T.D. and started toward the store door. Bettencourt was standing in the parking lot. Petitioner was next to J.P. T.D. pointed the gun in the direction of petitioner, who was still beside T.D., and yelled to get the doors. J.P. stood in front of the

doors of convenience store. He did not say or do anything to suggest he had a gun. He did not touch David, except that they were "shouldering" each other as David tried to get past J.P. to get inside the store. J.P. did this because T.D. had pointed the gun in his and petitioner's direction and told them to get the door. J.P. was scared. He did not know whether T.D. would fire, and felt anyone could have gotten shot.

David got past J.P. J.P. saw Bettencourt standing in front of T.D., on the side of the car. T.D. pointed the gun at Bettencourt, between his chest and his nose, and yelled to give him the money. Petitioner also was yelling at Bettencourt but J.P. did not know what he was saying. J.P. did not recall petitioner's location.[14] Bettencourt took money from somewhere and threw it toward T.D.'s face. J.P. then saw T.D. shoot twice. J.P. ran. T.D. and petitioner also ran, although T.D. picked up the money. J.P. never asked for or received any of it.

Petitioner knew someone who lived around the corner from the convenience store, so the three hopped the fence into the person's backyard. T.D. and petitioner appeared to be drunk. As either T.D. or petitioner was hopping over the fence, he fell into the doors and the doors opened. A lady was walking in the kitchen, and petitioner told her that he knew her brother. The lady got her brother, who went into the garage with the three. At some point, T.D., who seemed kind of surprised, said he dropped the gun and lost one of his shoes at the convenience store. The brother gave T.D. a shoe. Petitioner told the brother they had been at a party and someone was shooting at them, and that they needed a ride.

The three were given a ride to petitioner's house. Petitioner talked to his mother, who came out, looking shocked and upset. She took them to T.D.'s house in Turlock.

---

[14] However, on cross-examination, J.P. stated petitioner was "[s]omewhere behind or to the side of [T.D.]" when he was yelling, and was "around" T.D. at the time of the shooting.

17.

Petitioner's mother then told T.D.'s mother what happened. T.D.'s mother asked T.D. why he did it. J.P. believed T.D. responded, "If I did it once, I can do it again."

J.P. then left. He was almost across the street when petitioner and T.D. came out of the house. The three crossed Columbia Park, hopped a couple of fences, and went to the house of a girl J.P. knew. T.D. had a shotgun in a case in his hand and a small leather pouch full of shotgun shells. While the three were walking across the park, T.D. said that if any cops were to pull up, he would just start shooting at the cops. He said that if he went to prison he would be "on the main line" with his father. T.D. told J.P. not to snitch.

The three were the only ones at the house. J.P. was lying on the couch by himself, and T.D. and petitioner were talking to each other and joking. They asked J.P. what was wrong with him and why he was so down. J.P. told them it was not a game, and that somebody just got shot. J.P. felt a bit intimidated because there was a shotgun present and the others did not feel the way he did. T.D. told J.P. not to snitch and nothing would happen.

The three stayed at the girl's house from about 4:00 a.m. until around 5:00 a.m. or 6:00 a.m., when T.D.'s mother came, and petitioner and T.D. left with her. She asked if J.P. wanted to go, but he declined. He stayed at the girl's house for a while, then went home. That was the last time he saw either petitioner or T.D. outside of court. J.P. later turned himself in.

In March 2012, J.P. was interviewed by the prosecutor's investigator and the prosecutor. J.P.'s attorney requested, but was not present during, the meeting. J.P. gave the statement so he would not have to spend the rest of his life in prison. He thought he might get some kind of deal, although that did not happen. J.P. told the investigator and the prosecutor the truth and did not refuse to answer any of their questions.

Dr. Marczinski, an associate professor of psychology at Northern Kentucky University, testified to T.D. and J.P.'s jury as a defense expert in alcohol mixed with

18.

energy drinks (AED). With regard to petitioner's jury, the parties stipulated Marczinski would testify that, as sold in August 2010, Four Loko was a mixture of alcohol and energy drink. Drinking an AED such as Four Loko will cause the same intoxicating effects in humans as any other alcoholic beverage with the same amount of alcohol content. In some cases, drinking an AED like Four Loko can cause the observable effects of alcohol intoxication to be masked or hidden to the drinker and people observing the drinker. One can of Four Loko, as found by Timothy at the school, contained 23.5 fluid ounces of beverage. The alcohol concentration of that beverage was 12 percent by volume, which was the same percentage of alcohol as most wine. Each 23.5-ounce can of Four Loko contains the alcohol and intoxicating equivalent of 4.7, 12-ounce cans of beer or 4.7, five-ounce glasses of wine. Marczinski watched the market and convenience store videos and observed no objective symptoms of alcohol intoxication exhibited by T.D., J.P., or petitioner. Some typical objective symptoms of alcohol intoxication include lack of balance, falling down, vomiting, slurred speech, and passing out.

### B. New Evidence at the Evidentiary Hearing

At the evidentiary hearing, the People entered into evidence the convenience store surveillance video. They otherwise relied on the transcripts of petitioner's trial and the trial exhibits, and did not present new evidence.

Petitioner entered into evidence the market surveillance video. He also called private investigator Wallace as a hearing witness. Wallace worked petitioner's case at the time of his trial and again for the section 1172.6 resentencing hearing. He again testified he had experience attempting to spot people carrying concealed firearms. Petitioner played the market surveillance video while Wallace testified that T.D. appeared to have something heavy, like a firearm, in his pants. However, J.P. and petitioner did not, at any time during the video, have the same trouble keeping their pants up. Wallace testified that, at one point in the video, T.D.'s shirt pulled "somewhat more snugly over his right hip and you can see something of a sharp angular nature up here

19.

underneath his shirt," suggesting there was a "firearm present." Wallace testified that he saw "more evidence of [T.D.] carrying a firearm or something of that nature in his waistband," particularly the angular object in his waistband, than he had previously testified to. He also noticed T.D. appeared to be looking down in the area on his waistband, and Wallace opined T.D. was "checking on the visibility of the firearm." Wallace opined that T.D. appeared to have a firearm in his possession and J.P. and petitioner did not.

Wallace also testified that he mapped out the route he believed petitioner, T.D. and J.P. took from the bus stop to petitioner's home in Riverbank. He personally visited the bus stop closest to petitioner's mother's residence. He also visited the residence and traced the walking route between the bus stop and the residence. He noted that J.P. reported that they robbed an ice cream vendor on the walking route from the bus stop to the residence. Wallace spent "at least weeks" investigating the alleged robbery but was unable to corroborate J.P.'s account of the ice cream robbery. He did not find or talk to any ice cream vendors, let alone any who had been robbed. The Riverbank Police Department had no record of any such robbery. He additionally talked to two or three wholesalers who sold ice cream to ice cream vendors and none of them had knowledge of any of their customers being robbed. He also talked to grocery stores and others selling ice cream to determine where they got their ice cream. None of them knew of any robbery. However, Wallace acknowledged not every crime is reported.

On cross-examination, Wallace acknowledged he did not have training in spotting people carrying concealed weapons. He acknowledged that, in the market surveillance video, both T.D. and petitioner were wearing baggy clothes that could conceal a firearm. He also acknowledged that he did not see a gun in the video. He acknowledged that someone who is accustomed to carrying a firearm would not be as concerned about his appearance as someone who was not accustomed to carrying a gun. Wallace did not know if T.D. habitually fiddled with or habitually pulled up his pants or underwear.

20.

Petitioner also called T.D. as a witness at the hearing. T.D. testified he had known petitioner since childhood but had not been in communication with him since T.D. was released from prison. T.D. had viewed the market surveillance video and noticed that he appeared to be tugging on his waistband or pants several times. He acknowledged it appeared he had a gun in his waistband. He did not recall whether anyone purchased alcohol for the trio at the market. T.D. did not recall petitioner giving him the gun he was alleged to have used during the shooting. He did not recall where the gun came from. He did not recall anything from that night, including whether anyone told him to shoot Bettencourt.

Petitioner also testified at the hearing. He testified that, at the time of the shooting, T.D. was his friend, and he knew J.P. through T.D. The three of them were together in Riverbank on the day of the incident and spent hours walking from place to place. They first visited petitioner's mother's house at approximately 1:00 p.m. From there, they walked to a school behind the movie theater, looking for someone to buy them alcohol. They eventually found someone who agreed to buy them alcohol and they went to the market, where the man purchased them Four Lokos. Petitioner knew T.D. had a handgun in his waistband at the market.

The trio left the market and went back to the school to drink. After a couple of hours, they left to get more alcohol. As they approached the convenience store, they had no plans other than finding someone to purchase alcohol for them. One car was parked at the convenience store. David and Bettencourt got out of the car and went into the convenience store as petitioner and his companions walked up.

Petitioner, T.D. and J.P. walked to the front window of the convenience store and stood near the wall. Petitioner stood approximately five feet from the car. At some point, David and Bettencourt exited the store. David went to the driver's side door and Bettencourt went to the passenger side door. T.D. left the wall and went toward David and the driver's side of the car. T.D. pulled the gun on David and said something, and

21.

they both walked behind the car. Petitioner and J.P. followed toward the back of the car "a couple of seconds later." Bettencourt was at the passenger side of the car and David took off running toward the front of the store. T.D. pointed the gun at petitioner and J.P. and told them to get David. Petitioner stood there and J.P. chased David. J.P. caught David and wrestled with him to try to physically stop him from going in the store, but he was unsuccessful. While they wrestled, petitioner was by the wall of the store where he started.

While petitioner was standing there, T.D. went to Bettencourt. He pointed the gun at Bettencourt and demanded money. Bettencourt pulled out money and threw it at T.D.'s face. T.D. then shot Bettencourt. Petitioner ran, as did J.P. and T.D. Petitioner ran because he was scared.

Petitioner denied giving T.D. the gun or giving T.D. or anyone any orders regarding what was to happen at the convenience store. Petitioner did not have a gun and, to his knowledge, J.P. did not have a gun. However, T.D. had the gun throughout the day. Petitioner denied that he robbed an ice cream man. He denied that he had considered robbing "two old ladies."

On cross-examination, petitioner confirmed that he, J.P. and T.D. took a bus to Riverbank on the day of the shooting, and walked approximately two blocks to his mother's house. There, they drank one Four Loko that his stepfather purchased for them and took another of the Four Lokos with them as they walked through Riverbank in the evening. They spent time drinking at an elementary school before they saw some people walking in an adjacent movie theater parking lot and asked them to purchase alcohol. T.D. had a gun at the time they went to the market, and petitioner did not recall where T.D. obtained it. T.D. had carried the gun with him a few times previously. Petitioner had seen the gun earlier in the day when he woke up at T.D.'s house.

As petitioner and his companions walked up to the convenience store, the plan was to get someone to buy them alcohol. They saw David and Bettencourt getting out of the

22.

car as they walked up, but did not ask David and Bettencourt to buy them alcohol because by that point they were already in the store. When David and Bettencourt exited the store, petitioner and his companions did not ask them for alcohol. When T.D. pulled the gun on David, he was approximately 10 feet in front of petitioner. Petitioner followed a couple of seconds after T.D. and heard T.D. ask David for the keys to the car. By the time David got past J.P. and into the store, petitioner was "[p]robably by the front" of the store. He was approximately 10 feet away from T.D. Once T.D. pointed the gun at petitioner, petitioner did not move. After T.D. pointed the gun at Bettencourt, petitioner said, "Hey, let's go." Although T.D. had not shot anyone at that point, petitioner "guess[ed] he would have used [the firearm]." T.D. then shot Bettencourt and petitioner ran.

Petitioner admitted that he was charged in 2010 with assault with a firearm, assault with force likely to cause great bodily injury, shooting at an occupied motor vehicle, discharge of a firearm with gross negligence, and trying to dissuade a witness. Additionally, prior to the instant offense, petitioner assaulted a man at a gas station convenience store in Redding, but was found not guilty of assault and pled no contest in 2019 to a violation of section 186.22, subdivision (d). Petitioner also was charged with or convicted of offenses while incarcerated, including a 2017 conviction for possession of drugs in prison (§ 4573.6), a charge for conspiring with his mother to bring drugs into prison, and a 2019 conviction for possession of drugs in prison (§ 4573.8).

## C.     Ruling

The court determined the People had met their burden of proving, beyond a reasonable doubt, that petitioner was guilty of murder based on the testimony at trial. With regard to the disputed factual issues, the court noted it found compelling the testimony of petitioner's mother, who overheard a statement regarding petitioner furnishing the weapon, and also found compelling the video evidence, which corroborated J.P.'s trial testimony. The court specifically found petitioner was a major

23.

participant in the underlying offense and acted with reckless indifference to human life, and alternatively that the conviction could be sustained because petitioner "aided or abetted or assisted in the commission of the murder" with intent to kill. Accordingly, the petition for resentencing was denied.

**DISCUSSION**

I. **Section 1172.6 Procedure**

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437) "altered the substantive law of murder in two areas." (*People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*).) First, the bill narrowed the scope of the felony-murder rule "so that a 'participant in the perpetration or attempted perpetration of a [specified felony] in which a death occurs' can be liable for murder only if '[t]he person was the actual killer'; '[t]he person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree'; or '[t]he person was a major participant in the underlying felony and acted with reckless indifference to human life.' " (*People v. Arellano* (2024) 16 Cal.5th 457, 467–468, quoting § 189, subd. (e)(1)–(3).) Second, the bill "eliminate[d] liability for murder as an aider and abettor under the natural and probable consequences doctrine" by requiring that, "except in cases of felony murder, 'a principal in a crime shall act with malice aforethought' to be convicted of murder." (*Curiel*, at p. 449, quoting § 188, subd. (a)(3).) Now, " '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' " (*Curiel*, at p. 449.)

Additionally, Senate Bill No. 1437 added former section 1170.95, now section 1172.6, to provide a procedure for those convicted of a qualifying offense " 'to seek relief' where the two substantive changes described above affect a defendant's conviction." (*Curiel*, *supra*, 15 Cal.5th at p. 449.) Under section 1172.6, an offender seeking resentencing must first file a petition in the sentencing court, and the sentencing

court must determine whether the petitioner has made a prima facie showing that he or she is entitled to relief. (§ 1172.6, subds. (a)–(c); accord, *People v. Strong* (2022) 13 Cal.5th 698, 708.) If the sentencing court determines the petitioner has made a prima facie showing, the court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction. (§ 1172.6, subds. (c), (d)(1).)

At this evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. . . . The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (*Ibid*.)

## II. Sufficient Evidence of Felony-murder Liability

The superior court found petitioner was ineligible for resentencing because the prosecution had proved beyond a reasonable doubt that he was guilty of murder as a major participant in a qualifying felony who acted with reckless indifference to human life. Petitioner contends the evidence was insufficient to support these findings. We disagree.

### A. Standard of Review

We review the court's findings for substantial evidence. (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) "Under this standard, 'we review the record " ' "in the light most favorable to the judgment below to determine whether it discloses substantial evidence— that is, evidence which is reasonable, credible, and of solid value—such that a reasonable

trier of fact" ' " ' could find beyond a reasonable doubt that [petitioner] acted with reckless indifference." (*Emanuel*, *supra*, 17 Cal.5th at p. 885.)

## B. Felony Murder Under Current Law

Since the passage of Senate Bill No. 1437, section 189, subdivision (e)(3) provides that a participant in a qualifying felony where a death occurs may be liable for murder if the person was "a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." Section 190.2 "identifies the circumstances under which murderers and accomplices can be punished by death or life imprisonment without parole. . . . For defendants who did not kill and lacked intent to kill, section 190.2, subdivision (d) permits such punishment only if they acted 'with reckless indifference to human life and as a major participant' [in] a qualifying felony like robbery." (*People v. Douglas* (2020) 56 Cal.App.5th 1, 7; see *In re Scoggins* (2020) 9 Cal.5th 667, 674 (*Scoggins*).)

"[T]he major participant and reckless indifference concepts trace their origin to a pair of United States Supreme Court decisions—*Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*)—that articulate the constitutional limits of capital punishment for accomplices to felony murder." (*Emanuel*, *supra*, 17 Cal.5th at p. 882.) "In *Enmund*, the [United States Supreme Court] held that a minor participant in an armed robbery (the getaway driver), who neither intended to kill nor had any other culpable mental state, was ineligible for the death penalty. [Citations.] A few years later, the [United States Supreme Court] revisited the issue in *Tison*, considering the case of defendants who broke two convicted murderers out of prison, armed the escaped prisoners, captured and then held a family of passing motorists at gunpoint while the escapees deliberated whether to kill them, and then abandoned the victims in the remote desert after the escapees shot them. [Citation.] The court held that 'major participation in the felony committed, combined with reckless indifference to human life,' provides a sufficient degree of culpability to be eligible for a sentence of

death.  [Citation.]  Section 190.2, subdivision (d), added by voter initiative in 1990 (Prop. 115, as approved by voters, Primary Elec. (June 5, 1990) § 10) was designed to codify the holding of *Tison* and, by extension, the related holding of *Enmund*."  (*Emanuel*, at p. 882.)

Following *Enmund* and *Tison*, the California Supreme Court "endeavored to elucidate the contours of the major participant and reckless indifference standards" in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).  (*Emanuel*, *supra*, 17 Cal.5th at p. 882.)  In *Banks*, our Supreme Court identified the following nonexhaustive factors as relevant to the major participation inquiry:  "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Banks*, at p. 803, fn. omitted.)  However, the court explained, "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient."  (*Ibid*.)

Subsequently, in *Clark*, the high court addressed the "reckless indifference" standard.  The court explained that reckless indifference to human life "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions."  (*Clark*, *supra*, 63 Cal.4th at p. 617.)  The court further explained that reckless indifference to human life has both a subjective and an objective component.  (*Ibid.*)  Subjectively, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create."  (*Banks*, *supra*, 61 Cal.4th at p. 801; accord,

27.

*Clark*, at p. 617.) Objectively, " '[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Clark*, at p. 617.)

In *Clark*, the high court provided the following nonexhaustive list of factors to be considered in determining whether the defendant acted with reckless indifference: (1) knowledge of weapons, and use and number of weapons; (2) physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) duration of the felony and period of interaction between the perpetrators and the victims, (4) the defendant's knowledge of his or her cohort's likelihood of killing, and (5) the defendant's efforts to minimize the risk of violence during the felony. (*Clark*, *supra*, 63 Cal.4th at pp. 618–623.) Like the factors considered in *Banks*, " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, at p. 618.)

Our Supreme Court has explained, "[t]he degree of risk to human life is crucial to the [reckless indifference] analysis." (*Scoggins*, *supra*, 9 Cal.5th at p. 682.) " 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement." (*Id.* at p. 677.) Our Supreme Court "has thus made clear that participation in a ' "garden-variety armed robbery," ' i.e., one in which the only factor supporting a reckless indifference finding is that a participant was armed with a gun, is insufficient without more to establish reckless indifference." (*Emanuel*, *supra*, 17 Cal.5th at p. 884.) "The 'totality of the circumstances' must be analyzed to determine whether the defendant acted with reckless indifference." (*Id.* at p. 885.)

**C.    Major Participation**

Substantial evidence supports the superior court's finding that petitioner was a major participant in the carjacking under the *Banks* standard.

**i.    Petitioner's Role in Planning the Criminal Enterprise**

Petitioner played a major role in planning the criminal enterprise that led to Bettencourt's death.  Although the record does not necessarily establish that petitioner planned for the group to engage in a carjacking, the evidence is nonetheless sufficient to establish petitioner planned to engage in some kind of armed felony, and that plan ultimately led to Bettencourt's death.  More specifically, there is substantial evidence that petitioner began the evening by arming himself with a firearm.  He then robbed an ice cream man at gun point and suggested to his companions that they rob two women leaving the movie theater.  When his companions declined, he told T.D. not to "bitch up" or "get soft" and gave him the firearm.  He did not appear to exhibit surprise when T.D. pointed the firearm at David and, instead, followed as T.D. pursued David around the back of the car.[15]  In summary, petitioner carried out one crime in the afternoon or early evening, attempted to involve his coparticipants in a second crime, and ultimately challenged T.D. to engage in further criminal conduct, even if the precise nature of the intended felony (i.e., carjacking, as opposed to robbery), was unanticipated.

Nonetheless, petitioner suggests the attempted carjacking was "an unplanned crime of opportunity."  He points out that he gave T.D. the firearm earlier in the evening "when there was no plan to commit a carjacking or a robbery"; this occurred at a different location than the carjacking and upon T.D.'s request, which, according to petitioner,

---

[15] The People rely on gang-related evidence to support a theory that petitioner planned or encouraged the murder as the more senior member of the gang to which he and T.D. belonged.  However, we need not consider the gang evidence to conclude substantial evidence supports a finding that petitioner planned to engage in an armed felony.

suggests he did not anticipate T.D. would use the firearm to commit a crime. However, the trial court, acting as fact finder, could reasonably infer from the evidence that petitioner wished to commit another robbery that evening and was encouraging T.D. to participate. Petitioner gave T.D. the firearm and did not thereafter retrieve it. He knew T.D. remained armed and petitioner himself had primed T.D. to commit an armed felony. Taken together, these facts are sufficient to support a finding that petitioner played a major role in planning the criminal enterprise that led to Bettencourt's death.

Accordingly, this factor weighs in favor of a finding that petitioner was a major participant in the underlying offense.

### ii. Petitioner's Role in Supplying or Using Lethal Weapons

The evidence supports a finding that petitioner armed T.D. prior to the encounter. Although petitioner disputes his role in supplying the weapon, J.P. testified that petitioner possessed and displayed the firearm at different times before ultimately giving the firearm to T.D. Additionally, petitioner's mother heard T.D. asking petitioner about the "piece" while the trio was at her house, and her testimony also suggested petitioner had the financial means to purchase a firearm based on a recent legal settlement. We note the superior court expressly stated that it credited petitioner's mother's testimony. This factor weighs in favor of a finding that petitioner was a major participant in the underlying offense.

### iii. Petitioner's Awareness of the Dangers Posed by the Nature of the Crime, Weapons Used, or Other Participants

The evidence does not suggest petitioner was aware that T.D. was likely to engage in deadly violence. Although T.D. and petitioner had been friends for many years, and evidence was presented to suggest T.D. had a history of behavioral issues and making threats of violence in school, it is not clear that petitioner was aware of that history. Nor would T.D.'s school history necessarily suggest to petitioner that his conduct would escalate to murder. The evidence also does not suggest petitioner was aware of any

30.

dangers inherent in the nature of the offense or the use of a firearm, beyond the dangers inherent in a " ' "garden-variety armed robbery," ' " i.e., a robbery in which one or more participants are armed with a gun. (*Emanuel*, *supra*, 17 Cal.5th at p. 884.) Accordingly, this factor is neutral in our analysis.

### iv.  Petitioner's Presence at the Scene of the Killing

The fourth *Banks* factor considers whether petitioner was present at the scene of the killing and in a position to facilitate or prevent the actual murder, and whether his own actions or inaction played a particular role in the death. (*Banks*, *supra*, 61 Cal.4th at p. 803.) "In cases where lethal force is not part of the agreed-upon plan, absence from the scene may significantly diminish culpability for death. [Citation.] Those not present have no opportunity to dissuade the actual killer, nor to aid the victims, and thus no opportunity to prevent the loss of life. Nor, conversely, are they in a position to take steps that directly and immediately lead to death . . . ." (*Id.* at p. 803, fn. 5.) In contrast, this factor may weigh in favor of a finding of major participation where the defendant is actively involved in every element of the offense and physically present during the criminal activity culminating in the murder. (*Id.* at p. 802.)

Here, petitioner was actively involved in and physically present for all the criminal activity culminating in the murder. T.D. pulled a gun, pointed it at David, racked the slide, and told David he would "blast" him, putting petitioner on notice of the likelihood the offense would escalate to deadly violence.[16] Again, petitioner did not exhibit surprise

---

[16] Petitioner argues the fact that T.D. did not shoot David would have indicated to petitioner that the incident *would not* result in deadly violence. However, on appeal, we do not resolve competing inferences that may be drawn from the evidence. (*People v. Tice* (2023) 89 Cal.App.5th 246, 256.) Rather, we must resolve whether the evidence, viewed in the light most favorable to the judgment, supports the inferences drawn by the finder of fact. (*Id.* at pp. 255–256.) On this point, we note that petitioner testified at the evidentiary hearing that T.D. had a gun during the incident, and further testified, "I guess he would have used it." A trier of fact could reasonably infer from this and other

at this turn of events. Rather, petitioner followed T.D. as he pursued David around the car. While David fled and J.P. ultimately pursued him to the convenience store doors, petitioner stayed near T.D. and the car and yelled something at Bettencourt before T.D. shot him. Although the time between T.D. pulling out the firearm and his firing of the fatal shots was relatively short, at just under one minute, the shooting was preceded by a series of events in which petitioner seemed to facilitate, rather than restrain, T.D.'s actions leading up to the murder. At the very least, petitioner was present at the scene and actively participated in the attempted carjacking by acting in concert with T.D. to intimidate David and Bettencourt.

Accordingly, this factor weighs heavily in favor of a finding that petitioner was a major participant in the carjacking.

### v. Petitioner's Actions After Lethal Force Was Used

After lethal force was used, petitioner did not attempt to render aid to Bettencourt. Rather, petitioner facilitated the trio's escape by taking them to a nearby home to hide. He then took the trio to his mother's house and obtained a ride for all of them to Turlock. From there, he remained with T.D., and the two ultimately were apprehended together in Redding. His conduct following the shooting does not indicate he repudiated T.D.'s conduct, but rather that he supported it and believed himself to be implicated in the murder. Petitioner's conduct notably contrasts with that of J.P., who attempted to break off from his cohorts shortly after the murder, and ultimately did so, eventually turning himself in to law enforcement.

### vi. Totality of the Circumstances

We must consider the totality of the circumstances in determining whether the evidence supports a finding that petitioner was a major participant in the underlying

---

testimony that petitioner understood, by the time T.D. pointed the gun at David, racked the slide, and threatened to shoot, that T.D. was willing to use deadly force.

attempted carjacking. (*Banks*, *supra*, 61 Cal.4th at p. 802.) The ultimate question is whether petitioner's involvement in the offense was "substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder." (*Ibid.*) Here, petitioner armed T.D. and encouraged him to commit an armed felony. Petitioner was present for the duration of the offense and acted in concert with T.D. as he pursued David and confronted Bettencourt during the attempted carjacking. He also aided his coparticipants in their escape, ultimately fleeing the area with T.D. Taken together, the foregoing constitutes substantial evidence to support the superior court's finding that petitioner was a major participant in the underlying felony.

### D. Reckless Indifference

Substantial evidence also supports the superior court's finding that petitioner acted with reckless indifference to human life, as defined in *Clark*, and as recently clarified in *Emanuel*. The evidence regarding many of these factors overlaps with the evidence supporting the *Banks* factors.

#### i. Use or Awareness of the Presence of Weapons

We have already explained that substantial evidence supports a finding that petitioner furnished, and therefore had knowledge of, the single firearm used in the offense. Furthermore, the evidence suggests petitioner encouraged T.D. to commit a felony prior to arming him. Although "[t]he mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life," this factor nonetheless weighs in favor of such finding. (*Clark*, *supra*, 63 Cal.4th at p. 618.)

#### ii. Knowledge of a Cohort's Likelihood of Killing

We again acknowledge the evidence does not suggest petitioner had prior knowledge that T.D. had a propensity for violence or was likely to use lethal force. This factor does not weigh in favor of a finding of reckless indifference.

### iii.   Duration of Crime

Our Supreme Court recently clarified that this factor focuses on "the period of the violent confrontation." (*Emanuel*, *supra*, 17 Cal.5th at p. 886.)  " 'Courts have looked to whether a murder came at the end of a prolonged period of restraint of the victims by defendant. . . .  Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, "there is a greater window of opportunity for violence" [citation], possibly culminating in murder.' " (*Ibid*.)  Where the period of violent confrontation is too brief to "heighten the risk of violence beyond that inherent in the [felony] itself," this factor is neutral.  (*Ibid*.)

Here, as stated, the period of violent confrontation was relatively brief, lasting just under one minute.  Accordingly, this factor is neutral in our analysis.

### iv.   Efforts Taken To Minimize the Risk of Violence

Our Supreme Court recently clarified that this factor focuses on facts relevant to the minimization of risk during the *planning stage*, rather than during the crime itself. (*Emanuel*, *supra*, 17 Cal.5th at pp. 887–888.)  " '[T]he existence of efforts to minimize violence does not necessarily foreclose a finding of reckless indifference to human life.' " (*Id.* at p. 888.)  "Where an 'objective evaluation of the circumstances' of the crime suggests the risk of violence is grave, the defendant's apparent efforts to minimize that risk may be unavailing.  [Citation.]  Conversely, the absence of such efforts does not necessarily evince a subjective disregard for risk where the objective circumstances of the planned crime suggest the risk of violence posed is no more than that inherent in any violent felony." (*Ibid.*)  Thus, relevant "aspects of the felony" may " 'provide insight into both the magnitude of the objective risk of lethal violence' posed by the planned crime and [a defendant's] 'subjective awareness of that risk.' [Citations.]  Where a defendant plans to commit an armed home invasion robbery at 3:00 a.m., with knowledge of several armed occupants and a methamphetamine operation within, for example [citation], a trier of fact might reasonably conclude that the objective risk of violence posed by the crime

34.

and reasonably anticipated by the perpetrator is graver than the risk of violence inherent in any violent felony.  By contrast, where a defendant plans to commit an unarmed robbery of a marijuana dealer at a public park in the middle of the afternoon, the objective risk of violence posed by the crime and reasonably anticipated by the perpetrator is far less grave." (*Id.* at p. 889.)

It does not appear that the objective circumstances of the attempted carjacking posed a risk of violence greater than that inherent in any violent felony, with one exception.  Petitioner's conduct involved giving a firearm to a young teen who had consumed alcohol and who petitioner had told not to "bitch up" or "get soft," thereby priming him to escalate the offense when the victims did not cooperate.  The court, as fact finder, could reasonably infer that this conduct elevated the risk of violence inherent in this crime.  Based on this conduct, this factor weighs slightly in favor of a finding of reckless indifference to human life.

### v. Physical Presence at the Scene and Opportunity To Restrain Confederates and Aid Victims

A defendant's physical presence at the scene of the murder and underlying crime is often relevant to assessing his or her degree of culpability.  (*Clark*, *supra*, 63 Cal.4th at p. 619.)  " 'Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the [co]participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force.  In such cases, "the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . .  [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts.  If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders." ' " (*Emanuel*, *supra*, 17 Cal.5th at p. 889.)

However, "where a crime unfolds quickly, this factor—the failure to restrain a cohort—cannot be said to weigh in favor of a finding of reckless indifference without some evidence in the record indicating that the defendant had a meaningful opportunity to do so.  [Citation.]  This requires some awareness of the risk of impending lethal violence *and time to react*." (*Emanuel*, *supra*, 17 Cal.5th at p. 892, italics added.)  Furthermore, a defendant's failure to intervene is relevant to this inquiry only to the extent it "reflect[s] intentional inaction indicative of reckless indifference to human life," (*id.* at p. 891), rather than a lack of control over the rapidly unfolding actions of a confederate (*id.* at p. 892).

Additionally, "a defendant's conduct following the use of lethal force may be reflective of his or her mental state during the offense." (*Emanuel*, *supra*, 17 Cal.5th at p. 893.)  However, " 'when different inferences may be drawn from the circumstances, the defendant's actions after the [killing] may not be very probative of his mental state.' " (*Ibid.*)  For example, fleeing the scene, which may reflect an intent merely to avoid arrest, is not highly probative.  (*Id.* at pp. 893–894.)

Here, it is not petitioner's failure to restrain his cohorts in this rapidly unfolding crime that convinces us this factor weighs in favor of a finding of reckless indifference to human life.  Nor is petitioner's flight from the scene of the offense particularly significant.  Rather, it is petitioner's own affirmative actions during the attempted carjacking that convince us petitioner was "aware of and willingly involved in the violent manner in which the particular offense [was] committed, demonstrating reckless indifference to the significant risk of death his . . . actions create[d]." (*Banks*, *supra*, 61 Cal.4th at p. 801; accord, *Clark*, *supra*, 63 Cal.4th at p. 617.)

We reiterate that petitioner was physically present at the crime scene and actively involved in the events culminating in the murder.  Once T.D. pulled a gun, pointed it at David, racked the slide, and told David he would "blast" him, petitioner would have been aware that T.D. was willing to use lethal force.  Nonetheless, petitioner followed T.D. as

T.D. pursued David around the car. Additionally, when David and J.P. moved to the doors of the convenience store, petitioner stayed near T.D. and the car and yelled something at Bettencourt as T.D. demanded money from Bettencourt and ultimately shot him.

It is true that this interaction was brief, lasting just under one minute. However, the interaction was lengthy enough for petitioner to appreciate the risk of impending lethal violence. (*Emanuel*, *supra*, 17 Cal.5th at p. 892.) Petitioner seemingly responded to that risk by facilitating T.D.'s actions. A fact finder could reasonably infer from petitioner's conduct that petitioner knew T.D. was willing to use lethal force to carry out the felony, and that petitioner intentionally facilitated T.D.'s conduct with reckless disregard for the attendant risk to human life. (*Clark*, *supra*, 63 Cal.4th at p. 617, *Banks*, *supra*, 61 Cal.4th at p. 801.)

Accordingly, this factor weighs heavily in favor of a finding of reckless indifference.

### vi. Effect of Petitioner's Youth and Intoxication

Petitioner contends that the circumstances of the attempted carjacking, when considered "through the lens of [his] youth" and his intoxication, show that he did not have the mental state of reckless indifference to human life. Instead, he contends, the evidence shows he was merely an "intoxicated teenager" who did not "exercise good judgment" and did not subjectively appreciate the risk of death the incident carried.[17] He asserts that, "[u]nlike a mature adult, [petitioner] did not realize that Bettencourt might behave rashly" by throwing money at T.D., which conduct petitioner contends caused T.D. to shoot.

---

[17] The evidence presented to the trial court suggests that petitioner and his companions did not exhibit any outward signs of intoxication.

Both intoxication and youth may be relevant to the reckless indifference inquiry. (See *People v. Covarrubias* (2016) 1 Cal.5th 838, 898 [intoxication]; *People v. Jones* (2022) 86 Cal.App.5th 1076, 1091–1093 (*Jones*) [age]; but see *Emanuel*, *supra*, 17 Cal.5th at p. 885, fn. 6 [declining to address the significance of the petitioner's youth on the reckless indifference finding because the issue was not addressed in proceedings below].) However, these factors do not overwhelm consideration of all the other factors. (See *Tison*, *supra*, 481 U.S. at pp. 142, 151–152, 158 [death sentence could constitutionally be imposed on 19 year old if he was a major participant who acted with reckless indifference].) Furthermore, on substantial evidence review, the question before us is not whether the court *could have* found petitioner's youth and intoxication diminished his ability to appreciate the risk to life associated with the attempted carjacking, but rather whether substantial evidence supports the court's finding that petitioner *did* appreciate and disregard the risk to life.[18] We therefore turn to our consideration of the totality of the circumstances bearing on whether petitioner acted with reckless indifference to human life.

### vii. Totality of the Circumstances

We recognize that some of the *Clark* factors do not weigh in favor of a finding of reckless indifference. We are mindful, however, of our Supreme Court's admonition that no one of the *Clark* factors " 'is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, *supra*, 63 Cal.4th at p. 618.) Rather, we must evaluate these factors under the totality of the circumstances to determine petitioner's place on the " 'spectrum of culpability.' " (*Scoggins*, *supra*, 9 Cal.5th at p. 675; accord, *Emanuel*, *supra*, 17 Cal.5th at p. 885.)

---

[18] The superior court did not make any factual findings regarding petitioner's youth or intoxication, and we do not make such factual findings in the first instance. We separately address the question of whether the superior court *should have* considered petitioner's youth, *post*.

Here, petitioner encouraged T.D., a young teen who had consumed alcohol, to commit a felony and armed him with a firearm. Petitioner was physically present at the crime scene and actively involved in the events culminating in the murder. During the course of the crime, T.D. made clear his willingness to use lethal force to accomplish the carjacking. Petitioner nonetheless continued to aid T.D. in committing the crime. Considering the totality of the circumstances, this evidence is sufficient to support the superior court's finding that petitioner was recklessly indifferent to the risk to human life, and his disregard involved a gross deviation from the standard of conduct a law-abiding person would observe in his situation. (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)

## E.    Conclusion

In sum, substantial evidence supports the superior court's finding that petitioner was a major participant in the carjacking and acted with reckless indifference to human life.

## III.    Remand for Consideration of Petitioner's Youth

In supplemental briefing filed after transfer of this matter from the California Supreme Court to this court, petitioner argues that, even if the evidence is sufficient to support the superior court's findings, the matter should be remanded for the superior court to *redetermine* whether petitioner acted with reckless indifference to human life "through the lens of [petitioner's] youth." Although petitioner argued in the superior court that his youth was a relevant factor, he contends we should not presume the superior court considered any evidence or argument regarding his youth and further asserts that, at the time of the evidentiary hearing, "no case had squarely held that a superior court should consider the youth of a non-juvenile in determining a petition under section 1172.6." We agree that remand is appropriate on this basis.

## A.    The Scope of the Supreme Court's Transfer Order

As an initial matter, the People contend this argument is outside the scope of the Supreme Court's remand order and therefore outside our jurisdiction. However, the

39.

authority relied on by the People concerns the scope of a remittitur when our Supreme Court affirms, reverses, or modifies a judgment and remands with instructions. (See *Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 701.) Here, the Supreme Court did not affirm, reverse, or modify the judgment, nor did it remand the matter to this court or issue a remittitur. (Cal. Rules of Court,[19] rules 8.528(a), (c), 8.540(a).) Rather, the Supreme Court transferred the matter to us with instructions to reconsider our prior decision in light of *Emanuel*. (See rule 8.528(d) ["After ordering review, the Supreme Court may transfer the cause to a Court of Appeal without decision but with instructions to conduct such proceedings as the Supreme Court orders."].)

When the Supreme Court transfers a matter to a Court of Appeal without a decision but with instructions, the scope of permissible briefing is governed by rule 8.200(b). (See rule 8.528(f).) Rule 8.200(b)(2) provides that supplemental briefs after transfer from the Supreme Court are "limited to matters arising after the previous Court of Appeal decision in the cause, unless the presiding justice permits briefing on other matters." Here, as we explain, the issue of whether the court sufficiently considered petitioner's youth did not entirely arise after our decision in the case, and no briefing on additional matters was requested or permitted.

Nonetheless, published decisions filed after our prior decision in this case suggest that, if we do not address the issue of petitioner's youth in this appeal, petitioner could file a second petition for resentencing in the superior court to have the court consider his youth as part of the totality of circumstances bearing on whether he acted with reckless indifference to human life. (See *People v. Jimenez* (2024) 103 Cal.App.5th 994, 1008 (*Jimenez*).) Thus, in the interests of justice and for the sake of judicial economy, we address this argument on the merits.

---

[19] Undesignated references to rules are to the California Rules of Court.

### B. Additional Background

Petitioner's evidentiary hearing was held on November 1, 2021. At the hearing, petitioner argued, based on *In re Moore* (2021) 68 Cal.App.5th 434, 454 (*Moore*), that petitioner's youth should be considered in the court's analysis of the *Banks* and *Clark* factors. The People did not provide any argument on this point. The court's ruling did not address the argument.

### C. Applicable Law

At the time petitioner's evidentiary hearing was held, existing case law held that a defendant's youth was a relevant factor in determining whether the defendant was a major participant in the underlying felony who acted with reckless indifference to human life. (*Moore*, *supra*, 68 Cal.App.5th at p. 454; *People v. Harris* (2021) 60 Cal.App.5th 939, 960, abrogated on another ground by *People v. Lewis* (2021) 11 Cal.5th 952.)[20] However, these cases, which were decided mere months before the evidentiary hearing, involved defendants who committed their crimes as juveniles, and relied on principles derived from cases addressing the sentencing of juveniles to terms of life without the possibility of parole. (*Moore*, at p. 453; *Harris*, at pp. 944, 960; see *Jones*, *supra*, 86 Cal.App.5th at pp. 1092–1093.)

During the pendency of this appeal, the appellate court in *Jones* addressed the relevance of youth to the reckless indifference finding in a case involving a young adult who was 20 years old at the time of the offense.[21] (*Jones*, *supra*, 86 Cal.App.5th at p. 1092.) There, the section 1172.6 petitioner, again relying on cases addressing the sentencing of juveniles to a term of life without the possibility of parole, asked the trial court to consider his youth in determining whether he acted with reckless indifference to

---

[20] As stated, petitioner relied on *Moore* in his arguments to the superior court. He relied on *Harris* in his opening brief in this court.

[21] Petitioner relied on *Jones* in his reply brief to this court.

human life.  (*Jones*, at pp. 1091–1093.)  However, the trial court did not mention the petitioner's age or maturity when denying the resentencing petition.  (*Id.* at p. 1091.)  The appellate court noted that the evidentiary hearing was conducted, and the petition decided, "just a few weeks after *Harris*" and before *Moore* was decided.  (*Id.* at p. 1092.)  Although the petitioner was not a juvenile and did not appear to have been vulnerable to the influence of others or unable to appreciate the dangers of his activities and his coparticipants' actions, the court nonetheless concluded that the interests of justice were best served by allowing the trial court a meaningful opportunity to consider the petitioner's youth as part of the totality of the circumstances bearing on whether he was a major participant and acted with reckless indifference to human life.  (*Id.* at pp. 1092–1093.)  Accordingly, the order denying the petition was vacated and the matter remanded for further consideration.  (*Ibid.*)

In *People v. Oliver* (2023) 90 Cal.App.5th 466, the appellate court assumed, without deciding, that the trial court was required to consider the petitioner's youth in reference to the petitioner's mental state, but held that its failure to do so was harmless under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836.  (*Oliver*, at pp. 488–489 & fn. 8.)  The court noted the petitioner was 23 years old at the time of the crime and, "[p]resumably, the presumption of immaturity weakens as a defendant approaches 26."  (*Id.* at p. 489.)  Additionally, the court noted that the case law on youthful offenders focused on "(1) their relative impulsivity; and (2) their vulnerability to peer pressure," but there was no evidence that the petitioner's criminal behavior was motivated by either factor.  (*Ibid.*)  Accordingly, the court affirmed the denial of the petition.  (*Id.* at p. 470.)

While review of petitioner's case was pending before the California Supreme Court, additional cases were decided on this issue.  In *People v. Pittman* (2023) 96 Cal.App.5th 400, the trial court denied the petitioner's petition for resentencing on his second degree murder conviction in 2020, prior to any cases suggesting youth was a relevant factor bearing on a petitioner's mental state.  (*Id.* at p. 416.)  The petitioner's

attorney did not raise arguments regarding the petitioner's youth in the trial court and the trial court did not address this factor. (*Id.* at pp. 416–417.) On appeal, the court applied the *Watson* standard and concluded there was a reasonable possibility the failure to consider the petitioner's youth impacted the trial court's decision. (*Id.* at p. 417.) The court noted "[i]nferences of immaturity" could be drawn from the fact that the petitioner was 21 years old when he participated in the attack with two peers who were 16 and 17 years old. (*Id.* at p. 418.) Additionally, the crime suggested the participants acted impulsively, under the influence of rashness, and while intoxicated. (*Ibid.*) Thus, the court determined the interests of justice were best served by remanding for the court to consider whether youth impacted the petitioner's ability to form the requisite mental state for second degree murder. (*Ibid.*)

In *Jimenez*, *supra*, 103 Cal.App.5th 994, the petitioner brought a section 1172.6 petition for resentencing, which was denied after an evidentiary hearing in part on the ground the evidence proved the petitioner was an aider and abettor to second degree murder. (*Jimenez*, at p. 999.) The petitioner was 19 years old at the time of the offense and, although the petitioner's attorney had briefly mentioned the petitioner's status as a " 'youthful offender' " in the trial court, the trial court's order did not mention his age or maturity. (*Ibid.*) The Court of Appeal affirmed on the ground substantial evidence supported the finding the petitioner was guilty of directly aiding and abetting implied malice murder. (*Id.* at pp. 999–1000.) The petitioner then filed a second petition for resentencing based on then-recent amendments to section 1172.6 effectuated by Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill No. 775) (Stats. 2021, ch. 551). The second petition was denied at the prima facie stage on the ground that the changes effectuated by Senate Bill No. 775 did not apply and there was therefore no legal basis entitling him to a second petition for resentencing. (*Jimenez*, at p. 1000.)

On appeal from the denial of the second petition, the People argued the second petition was barred by the doctrines of collateral estoppel and law of the case. Citing

*Pittman*, the petitioner argued he was entitled to relief because the law had changed regarding whether his youth could be considered in determining whether he acted with implied malice. (*Jimenez*, *supra*, 103 Cal.App.5th at p. 1000.) The appellate court agreed that there had been a significant change in the law governing young adult offenders since the ruling on the first petition, and therefore the doctrines of collateral estoppel and law of the case did not apply. (*Ibid.*) In this regard, the court noted that early cases addressing this issue of a petitioner's youth applied only to juvenile offenders under the age of 18, and only to the major participant and reckless indifference findings. (*Id.* at pp. 1001–1002.) Thereafter, however, the law was expanded to hold that youth was a consideration for other mental state requirements, including implied malice, and additionally expanded to include young adults who were in their late teens and early 20's when they committed the crimes. (*Id.* at p. 1002.) Additionally, the Legislature had enacted similar changes to a variety of statutes to expand youth-related considerations to persons 25 years of age and younger. (*Id.* at p. 1004.)

The court held that, even if the threshold requirements for collateral estoppel were met, the equitable exception to application of the doctrine applied because the trial court may have felt compelled to conclude, based on the state of the law at the time, that youth was not a relevant consideration for an offender who is a young adult, rather than a juvenile. (*Jimenez*, *supra*, 103 Cal.App.5th at p. 1005.) Accordingly, principles of fairness required that the petitioner be given a new evidentiary hearing for the trial court to address the effect of his youth under current law. (*Id.* at p. 1006.) The court similarly concluded that the doctrine of law of the case did not apply because there had been significant intervening changes in law and the legal issues relating to the petitioner's youth were not decided in the prior appeal. (*Id.* at p. 1007.)

The court also determined that the error in failing to consider the petitioner's age was not harmless under the *Watson* standard. The court noted there was evidence the petitioner displayed the " 'hallmark features' of youth discussed in case law which may

44.

be relevant to determining whether he possessed the requisite mental state." (*Jimenez*, *supra*, 103 Cal.App.5th at p. 1007.)  Specifically, the petitioner was 19 years old at the time of the offense, and therefore on the younger end of the young adult age range. (*Ibid*.)  The evidence also supported an inference that the petitioner was subject to " 'peer pressure' " by a coparticipant.  (*Ibid*.)  Additionally, the only evidence supporting an inference that the petitioner was aware of the actual shooter's intent to kill was circumstantial; that same evidence supported an inference that the petitioner could have been " 'swept up in circumstances' beyond his control."  (*Id.* at p. 1008.)  Furthermore, the petitioner was less involved in the offense than the petitioner in *Jones*.  (*Ibid.*) Accordingly, the appellate court determined it would be in the interests of justice to give the trial court a meaningful opportunity to consider the petitioner's youth as part of the totality of circumstances bearing on whether he acted with malice and noted the petitioner would be permitted on remand to present new evidence bearing on the trial court's youthfulness analysis.  (*Ibid.*)  However, the appellate court noted it previously found the evidence legally sufficient to support the court's finding of malice and that holding was left undisturbed, despite petitioner's entitlement to a new evidentiary hearing to apply the new law.  (*Ibid.*)

### D. Analysis

The foregoing cases illustrate that petitioner is entitled to a new evidentiary hearing to apply new law relating to the effect, if any, of his youth on the court's reckless indifference finding.  Although petitioner briefly argued in the superior court that his youth should be considered in the court's analysis of whether he was a major participant in the underlying felony and acted with reckless indifference to human life, the superior court did not address this argument.  Indeed, the superior court may have felt compelled to conclude, based on the state of the law at the time, that petitioner's youth was not a relevant factor, given that petitioner was a young adult at the time he committed the offense and not a juvenile.

Additionally, we cannot say the court's failure to consider petitioner's youth was harmless under the *Watson* standard. Petitioner was 18 years old at the time of the murder, and his coparticipants in the offense were 14 and 15 years old. Petitioner's young age and his companionship with two younger individuals could support an inference that petitioner was relatively immature. Additionally, although the evidence does not suggest petitioner's participation in the offense was a result of peer pressure, his actions leading up to the offense might reflect rashness and impulsiveness associated with youth. Furthermore, the evidence supporting an inference that he was aware of the risk to human life inherent in his and T.D.'s conduct was circumstantial. The brief duration of the offense may support an inference that petitioner was " 'swept up in circumstances' beyond his control." (*Jimenez*, *supra*, 103 Cal.App.5th at p. 1008.)

Accordingly, it is in the interests of justice to afford petitioner a new evidentiary hearing at which the trial court will have a meaningful opportunity to consider petitioner's youth as part of the totality of circumstances bearing on whether he acted with reckless indifference to human life. We express no opinion as to what the result of that consideration should be.

## IV. The Denial of the Petition Is Not Supported on the Alternative Ground that Petitioner Acted with Intent To Kill

In addition to finding petitioner was a major participant in the underlying felony who acted with reckless indifference to human life, the superior court also found petitioner "aided or abetted or assisted in the commission of the murder" with intent to kill. Petitioner argues substantial evidence does not support this finding.[22] We agree.

---

[22] In our prior opinion, we did not address petitioner's challenge to the sufficiency of the evidence supporting the court's intent-to-kill finding because substantial evidence supported denial of the petition on another ground, i.e., that petitioner was a major participant in the underlying felony who acted with reckless indifference to human life. However, we have now determined that this ground for the denial must be reversed because the record does not reflect that the court considered the effect of petitioner's

46.

A participant in an enumerated felony in which a death occurs may be liable for murder if he or she "with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree." (§ 189, subd. (e)(2).) There is currently a split of authority as to whether this provision requires that a defendant aid and abet the commission of *murder* with intent to kill, or merely that the defendant aid and abet the commission of the *underlying felony* with intent to kill. (Compare *People v. Morris* (2024) 100 Cal.App.5th 1016, review granted July 17, 2024, S284751; with *People v. Kelly* (2024) 105 Cal.App.5th 162, review granted Nov. 26, 2024, S287341.) Our Supreme Court has granted review to resolve this question. However, we need not reach it because the evidence is insufficient to support a finding that petitioner aided and abetted either the murder or the attempted carjacking with intent to kill.

There is no evidence in the record to suggest this was a planned murder. Petitioner's conduct earlier in the day involved robbing an ice cream vendor and suggesting to his coparticipants that they rob two women exiting a movie theater. When petitioner told T.D. and J.P., "Don't bitch up," or "Don't get soft," it was in reference to their declining to commit an armed robbery. T.D. then asked to hold the gun and petitioner gave it to him. These facts support an inference that petitioner planned to commit an armed robbery with his coparticipants, not a murder.

Additionally, the attempted carjacking escalated rapidly once it began. The entire contact between the petitioner, his coparticipants, David, and Bettencourt, lasted just under one minute. We have held that the evidence regarding the coparticipants' contact with the victims during this brief interval supports an inference that T.D. was willing to use lethal force to accomplish the carjacking and that petitioner was aware of, and

---

youth as required under current law. Accordingly, we now address the superior court's alternative finding that petitioner acted with intent to kill.

disregarded, the risk that T.D. would use lethal force.  However, there is no evidence to support an inference that petitioner formulated a specific intent to kill Bettencourt during this brief interval.

Nonetheless, the People suggest the evidence supports a finding that petitioner intended to kill Bettencourt because, when Bettencourt threw money in T.D.'s face, he disrespected T.D. and, by extension, petitioner, who was "T.D.'s senior gang member." The People contend the tenets of petitioner's gang "included backing your fellow gang member and . . . punish[ing] disrespect to the gang."  Thus, the People contend, the trial court could infer that, when petitioner was yelling during the confrontation between Bettencourt and T.D., he was encouraging T.D. to shoot and kill Bettencourt.

The People's suggested inferences are purely speculative and not supported by the record.  As the People acknowledge, J.P. testified that petitioner was yelling at *Bettencourt* in the moments preceding the shooting, rather than at T.D.  There is no factual basis in the record for the court to infer petitioner verbally encouraged T.D. to shoot and kill Bettencourt during that time.  Furthermore, J.P.'s testimony suggested T.D. shot Bettencourt immediately after Bettencourt threw money in T.D.'s face.  The evidence does not support a finding that petitioner formulated an intent to kill in that brief interval.

Accordingly, substantial evidence does not support the superior court's finding that petitioner aided and abetted the murder with intent to kill.

## V.    Conclusion

Substantial evidence supports the court's finding that petitioner was a major participant in the underlying felony who acted with reckless indifference to human life. However, the record does not reflect that the court considered the effect of petitioner's youth under the totality of the circumstances bearing on the major participant and reckless indifference inquiries, as is required under current law.  Because not considering petitioner's youth was not harmless, and because denial of the petition cannot be

48.

supported based on the court's finding that petitioner aided and abetted the murder with intent to kill, we reverse the order denying the petition and remand for further proceedings, to include a new evidentiary hearing.

## **DISPOSITION**

The order denying the petition is reversed and the matter is remanded for further proceedings consistent with this opinion, to include a new evidentiary hearing.

DETJEN, Acting P. J.

WE CONCUR:

PEÑA, J.

MEEHAN, J.

49.